IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| JULIE A. SMITH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| KANSAS PUBLIC EMPLOYEES | ) | |
| RETIREMENT SYSTEM | ) | |
| Serve Executive Director At: | ) | |
| Alan Conroy | ) | |
| 611 S. Kansas Ave. Ste. 100 | ) | REQUEST FOR JURY TRIAL |
| Topeka, KS 66603 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW Plaintiff Julie A. Smith ("Plaintiff") and for her Complaint against Defendant Kansas Public Employees Retirement System ("Defendant KPERS") alleges and states as follows:

### Parties and Jurisdiction

1.     Plaintiff is a citizen of the United States, residing in Stillwell, Johnson County, Kansas, and, at all times pertinent to this Complaint for Damages, was an "employee" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), Age Discrimination in Employment Act of 1967 as amended 29 U. S.C. § 621 *et seq.* ("ADEA), and the Family Medical Leave Act, 29 U.S.C.A. § 2611 *et seq.* ("FMLA") and the amendments thereto.

2.     Defendant KPERS is a legal entity existing within the laws of the State of Kansas with its executive director, the individual to be served, located at 611 S. Kansas Ave., Ste 100, Topeka, KS 66603, and at all times pertinent to this Complaint for Damages, was an "employer" within the meaning of the ADA, ADEA, and FMLA.

1

**3.** This is an employment discrimination and retaliation lawsuit based upon and arising under the ADA, ADEA, and FMLA.

**4.** All of the unlawful acts and practices set forth below were committed within Shawnee County, Kansas. Jurisdiction and venue are proper in the District of Kansas pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1391.

<u>**Administrative Procedure and Procedural Posture**</u>

**5.** On or about October 23, 2017, Plaintiff timely filed a Charge of Discrimination against Defendant dually with the Equal Employment Opportunity Commission ("EEOC") and the Kansas Human Rights Commission ("KHRC") on the basis of Plaintiff's disability and/or Defendants perception that Plaintiff is disabled, on the basis of Plaintiff's age and on the basis of retaliation (attached as Exhibit A and incorporated herein by reference).

**6.** On or about March 30, 2018, the EEOC issued to Plaintiff Notice of Right to Sue (attached as Exhibit B and incorporated herein by reference).

**7.** The aforesaid Charge of Discrimination provided the KHRC sufficient opportunity to investigate the full scope of the controversy between the parties and, accordingly, the sweep of this judicial complaint may be and is as broad as the scope of an KHRC investigation of Plaintiff's claims and the involved parties, which could reasonably be expected to have grown out of the Charge of Discrimination.

**8.** Through the filing of Plaintiff's Charge of Discrimination, Defendant was afforded notice of Plaintiff's claims and the opportunity to participate in voluntary compliance.

**9.** Plaintiff has satisfied all private, administrative and judicial prerequisites to the institution of this action.

**General Allegations Common to All Counts**

**10.**     Plaintiff was an employee of Defendant from approximately May of 2008 until approximately August 23, 2017, when Plaintiff was constructively discharged.

**11.**     Plaintiff was employed by Defendant KPERS as a Fixed Income Investment Officer in Topeka, Kansas.

**12.**     In or around March of 2011, Elizabeth Miller (hereinafter "Miller") became Plaintiff's supervisor when she was hired as Chief Investment Officer.

**13.**     In or around September of 2013, Bruce Fink (hereinafter "Fink") was hired by Defendant KPERS as Deputy Chief Investment Officer for Public Markets, also becoming a supervisor of Plaintiff.

**14.**     In approximately April of 2013, Plaintiff applied for leave under the Family and Medical Leave Act ("FMLA") due to her medical condition, migraines.

**15.**     Plaintiff's migraines, at all times pertinent to this Complaint, did and continues to affect her major life activities, including self-care, working, sleeping, driving, seeing, learning, reading, communicating, and thinking.

**16.**     In 2014, Fink and Miller began to subject Plaintiff to a pattern of harassing conduct that created a hostile work environment for Plaintiff.

**17.**     On one occasion in or about 2014, Fink and Miller berated Plaintiff and began asking Plaintiff why she had been coming in late to work, despite the fact that Plaintiff had been taking FMLA time and both Fink and Miller were aware of Plaintiff's FMLA leave.

**18.**     Plaintiff informed Fink and Miller that she was coming in late due to her migraines.

**19.**     Plaintiff informed Fink and Miller that the medication she was taking for her migraines could cause Plaintiff to have difficulty concentrating.

**20.**     During this meeting, Plaintiff was in visible pain from her migraine and Miller stated in a sarcastic way, "oh you have a headache" and walked out of the room.

**21.**     Plaintiff began to suffer more frequent and intense migraines throughout approximately 2015 and 2016.

**22.**     Plaintiff noticed that as this occurred, Fink began to pick at Plaintiff's work more often than he had before.

**23.**     In or around August of 2015, Fink informed Plaintiff that he would be taking away her work from home day, which greatly increased Plaintiff's driving time.

**24.**     Upon information and belief, Fink took away Plaintiff's work from home day because of Plaintiff's migraines and because of Plaintiff having to use FMLA leave.

**25.**     On or about January 19, 2016, Fink wrote a letter to Plaintiff that addressed individual typos in Plaintiff's draft memos, including in a memo from September 2015, November 2015, and January 2016.

**26.**     The letter berated her for an incorrect date in the September memo draft, and a few typos such as writing "mortgaged backed securities" instead of "mortgage backed securities."

**27.**     Upon information and belief, Fink picked on minor things in Plaintiff's work because he was upset with Plaintiff because of her medical condition and because of Plaintiff using her FMLA leave.

**28.** Plaintiff informed Human Resources manager, Julie Baker (hereinafter "Baker"), that she believed that she was being extra-harshly criticized on every minute detail of Plaintiff's work due to Plaintiff's migraines.

**29.** Baker agreed that Plaintiff was being picked on and that she could see that Fink was being overly picky.

**30.** Baker informed Plaintiff that she could write a formal complaint but when Plaintiff responded that she was worried that it would only make the situation worse, Baker agreed with Plaintiff that it would make the situation worse.

**31.** From the time the discrimination and hostile work environment began, Plaintiff complained to Human Resources approximately three to five times a year.

**32.** Human Resources never did anything to correct the situation.

**33.** On or around April of 2016, Plaintiff renewed her FMLA and she was notified at that time by Baker that Plaintiff would now need to renew her FMLA every six months instead of annually. Baker stated that this was the case because Miller did not believe Plaintiff was suffering from migraines as often as Plaintiff had been reporting.

**34.** Baker further stated that Miller did not believe that Plaintiff could have a migraine in the morning and be able to recover enough to come to work within two hours.

**35.** Prior to this conversation, Plaintiff had sometimes been waking up at four or five o'clock in the morning with a severe migraine and calling in around six o'clock in the morning to ask if she could come in a few hours later to give Plaintiff time to hopefully feel well enough to be able to drive to work.

**36.**      Julie Baker told Plaintiff that she would need to get a doctor's note to send to Defendant KPERS stating that it was possible for Plaintiff to have a migraine that could subside enough to work within four hours, while other migraines may take one to two days to subside.

**37.**      Plaintiff's doctor completed this note for Plaintiff.

**38.**      Baker also told Plaintiff that she needed to call Miller as soon as she knew she was having a migraine and would miss work, even if it was in the middle of the night.

**39.**      This caused Plaintiff to sometimes get up at three o'clock in the morning, when Plaintiff was in severe pain, to call Miller and leave a message.

**40.**      Upon information and belief, these burdensome requirements were placed on Plaintiff because Miller was not happy about Plaintiff's medical condition and to make it more burdensome for Plaintiff to take FMLA leave.

**41.**      On or about August 25th and 26th of 2016, it was necessary for Plaintiff to be out of the office for treatment for acute migraines and Plaintiff provided Defendant with a doctor's note for this treatment.

**42.**      On or about August 27, 2016, Plaintiff alerted Fink that she had a debilitating migraine and would not be able to come in at eight in the morning but that she wanted to try and be there for a meeting that was scheduled a quarter after one that same afternoon.

**43.**      Approximately one hour before the meeting, when it became clear to Plaintiff that her migraine would make it impossible for her to attend the meeting, Plaintiff let Miller know that she would be unable to attend.

**44.**      On or about May 18, 2016, Plaintiff was counseled for missing the meeting and threatened with disciplinary actions, even though Plaintiff let Bruce Fink know as soon as possible and complied with FMLA policy.

**45.**     On or about May 27, 2016, Plaintiff received an email that stated she would no longer be allowed to take two hours of FMLA at a time but would only be allowed to take a full day or half day of leave. Plaintiff was informed that if she requested two hours of leave for her medical condition, her supervisor could require her to take four hours.

**46.**     On or about June 30, 2016, Fink gave Plaintiff an "Unsatisfactory" rating on her annual review and Plaintiff was put on an improvement plan for six months.

**47.**     Prior to this review, Fink had always given Plaintiff a "Meets Expectations" including in 2012, 2013, 2014, and 2015.

**48.**     Plaintiff's migraines have never caused her to take more time off than she was allowed for sick and vacation time.

**49.**     On or about December 31, 2016, Plaintiff was informed that her performance was getting better in some areas but still needed improvement.

**50.**     On or about June 14, 2017, Fink told Plaintiff to meet him at four in the afternoon for her performance review.

**51.**     When Plaintiff entered the room for the meeting she saw Alan Conroy, the Executive Director for Defendant, Julie Baker the Human Resources manager, Bruce Fink and Elizabeth Miller.

**52.**     Collectively these individuals informed Plaintiff that they had decided to let her go and that she had three options for her termination as follows:

  a. Accept a termination by Alan Conroy, effective July 14, 2017 with her last day worked being the current date, June 14, 2017;

  b. Accept a forced resignation effective September 15, 2017, with her last day worked being the current date, June 14, 2017 or;

c. Accept a short-term (17.5 month) employment agreement, signed by Alan Conroy, taking a demotion to the position of Investment Strategist that would last from June 16, 2017 to October 1, 2018.

53.     Plaintiff was put under immense pressure and only given forty-eight hours to consider the three options and due to Plaintiff's stress of having no income to support herself, Plaintiff accepted the last option to continue her employment and be terminated October 1, 2018.

54.     After Plaintiff was forced to make this decision, Defendant made her train her replacement.

55.     Even after Plaintiff accepted the demotion to Investment Strategist, the discrimination, harassment and retaliation continued.

56.     Plaintiff was shunned at work by her co-workers and managers and excluded from department meetings.

57.     Plaintiff initially believed she was not invited to the first of several quarterly investment meetings by accident, so she attended to the meeting.

58.     When Plaintiff arrived, Miller stated in front of three other employees, "You realize this is an investment meeting and you do not need to be here." This caused Plaintiff to feel humiliated.

59.     Plaintiff was not allowed to attend these meetings despite the fact that it was necessary for Plaintiff to do so in order to perform her job, as she needed access to the information provided at the meetings.

60.     Plaintiff was also excluded from the compliance meetings every month. Excluding Plaintiff from these meetings made it impossible for Plaintiff to do her job as she could not complete the reports that incorporated information gathered from those meetings.

8

**61.**     Plaintiff complained of discrimination and retaliation for being excluded from these meetings to Baker. Baker stated that she thought it would get better with Plaintiff's new job title.

**62.**     Baker informed Plaintiff that she could make a formal complaint.

**63.**     On or about August 14, 2017, Plaintiff made a formal complaint, which mentioned that Baker had previously discouraged Plaintiff from complaining about discrimination.

**64.**     After Plaintiff made her formal complaint, the retaliation and shunning became worse and got to the point that no one in the office would speak to Plaintiff.

**65.**     Upon information and belief, Plaintiff's complaints were not taken seriously or addressed.

**66.**     By approximately August 23, 2017, the hostile work environment, harassment and retaliation had become intolerable for Plaintiff.

**67.**     Plaintiff was suffering from anxiety, depression, difficulty sleeping, constant nausea and lack of appetite.

**68.**     Plaintiff could no longer bear the working conditions forced upon her and felt she had no choice but to resign.

**69.**     On or about August 23, 2017, Plaintiff was constructively discharged prior to the actual October 2018 discharge date of Defendant.

**70.**      On or about August 23, 2017, Plaintiff was clearing her belongings out of her office and asked one of her coworkers for assistance carrying a painting.

**71.**     Plaintiff's coworker hesitated and did not agree to help Plaintiff. Plaintiff asked him "do you not want to be seen with me?" but the coworker did not respond.

**72.**     It was extremely upsetting to Plaintiff that the work environment had become so bad that Plaintiff was shunned by a coworker who had previously been friendly with Plaintiff because he was afraid to be seen helping Plaintiff.

<u>**COUNT I - DISPARATE TREATMENT IN VIOLATION OF THE ADA**</u>

**73.**     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in the above-stated paragraphs.

**74.**     Plaintiff is disabled, as defined by the ADA, at all relevant times herein and/or Defendant regarded Plaintiff as being disabled.

**75.**     Specifically, Plaintiff suffers medical conditions which substantially limit her major life activities, including self-care, working, sleeping, driving, seeing, learning, reading, communicating, and thinking. At all relevant times, including prior to Plaintiff's termination, Defendant was aware that Plaintiff had a record of having such impairment.

**76.**     Plaintiff is a qualified individual as defined by the ADA, due to her disability and/or Defendants perception that Plaintiff is disabled.

**77.**     Plaintiff could perform the essential functions of her job duties with Defendant with or without reasonable accommodation.

**78.**     Defendant unlawfully and intentionally discriminated against Plaintiff based on her disability and/or because they regarded her as disabled, and acted in bad faith by interfering with, recklessly disregarding, and denying her legal rights when they terminated Plaintiff's employment.

**79.**     Specifically, Defendants conduct in violation of the ADA included:

a.     requiring overly burdensome and excessive requirements of Plaintiff to prove she suffers from migraines and to what extent;

b.      forcing Plaintiff to take a demotion or be fired; and

c.      constructively discharging Plaintiff.

**80.**    Plaintiff's disability and/or Defendants perception that Plaintiff is disabled, was a motivating factor in Defendants decision to terminate Plaintiff's employment.

**81.**    As a direct and proximate result of Defendants actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

**82.**    As a further direct and proximate result of Defendants actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress and mental anguish and pain, and related compensatory damages.

**83.**    By failing to take prompt and effective remedial action, Defendant in effect condoned, ratified and/or authorized the discrimination against Plaintiff.

**84.**    As shown by the foregoing, Defendants conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of the Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendant for economic damages, including, but not limited to: back pay, lost benefits, and front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

## COUNT II – DISPARATE TREATMENT BASED ON AGE
## IN VIOLATION OF ADEA

**85.**     Plaintiff hereby re-alleges and incorporates by reference the allegations contained in the above-stated paragraphs.

**86.**     During Plaintiff's employment with Defendant, Plaintiff was subjected to different terms and conditions of employment and an ongoing practice and/or pattern of discrimination/disparate treatment based on her age by Defendant.

**87.**     Plaintiff is at least forty (40) years of age.

**88.**     Plaintiff was subjected to different work requirements than other similarly situated younger employees in regard to the terms and conditions of her employment.

**89.**     Plaintiff's age was a motivating factor in Defendant's decision to discharge Plaintiff's employment.

**90.**     All actions or inactions of or by Defendant occurred by or through their owners, agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

**91.**     Defendant's actions constitute unlawful employment discrimination against Plaintiff in violation of ADEA, as alleged herein.

**92.**     As a direct and proximate result of the unlawful conduct of Defendant as set forth herein, Plaintiff has suffered damages which include emotional distress, pain and suffering, past and future wages and benefits, career damage and diminished career potential, mental distress in the form of embarrassment, degradation and humiliation which caused her to move to a different state, increased anxiety, increased difficulty sleeping, loss of enjoyment of life, significant weight loss and other non-pecuniary losses.

**93.** The conduct of Defendant was outrageous and evidence an evil motive or reckless indifference for the rights of Plaintiff and the rights of others, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendant for economic damages, including, but not limited to: back pay, lost benefits, and front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

## COUNT III - RETALIATION IN VIOLATION OF THE ADA

**94.** Plaintiff hereby re-alleges and incorporates by reference the allegations contained in the above-stated paragraphs.

**95.** Plaintiff is disabled and/or Defendant regarded her as disabled, as defined by the ADA, at all relevant times herein.

**96.** Plaintiff is a member of a protected class because of her disability and/or because she was regarded as being disabled, and because she requested an accommodation.

**97.** Plaintiff complained of and opposed discriminatory treatment when she made informal and formal complaints of discrimination and retaliation to Human Resources.

**98.** Plaintiff requested reasonable accommodation from Defendant due to her medical condition.

**99.** In retaliation for Plaintiff's complaints and/or request for accommodation, Plaintiff was forced to take a demotion or be terminated.

**100.** In retaliation to Plaintiff's claims of discrimination and/or request for accommodation, Defendant discharged/constructively discharged Plaintiff.

**101.**    As a direct and proximate result of the Defendant's actions and/or omissions, Plaintiff has been deprived of income, including wages and benefit as well as other monetary and non-monetary benefits.

**102.**    As a further direct and proximate result of Defendant's actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress and mental anguish and pain, and related compensatory damages.

**103.**    By failing to take prompt and effective remedial action, Defendant, in effect condoned, ratified and/or authorized the discrimination against Plaintiff.

**104.**    As shown by the foregoing, Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of the Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendant for economic damages, including, but not limited to: back pay, lost benefits, and front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

### COUNT IV - RETALIATION IN VIOLATION OF ADEA

**105.**    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in the above-stated paragraphs.

**106.**     Plaintiff is at least forty (40) years of age.

**107.**    Plaintiff is a member of a protected class because of her age.

**108.**    Plaintiff complained of and opposed discriminatory treatment when she requested Human Resources address the discriminatory treatment Plaintiff faced by Bruce Fink, Elizabeth Miller and other employees of Defendant.

**109.**    In retaliation for Plaintiff's complaints and/or request for accommodation, Plaintiff was improperly counseled for an approved absence and terminated/constructively discharged as a result of her age.

**110.**    All actions or inactions of or by Defendant's occurred by or through their owners, agents, servants, or employees acting within the course and scope of their employment, as set forth herein.

**111.**    Defendant's actions constitute unlawful employment discrimination against Plaintiff in violation of ADEA, as alleged herein.

**112.**    As a direct and proximate result of the unlawful conduct of Defendant as set forth herein, Plaintiff has suffered damages which include emotional distress, pain and suffering, past and future wages and benefits, career damage and diminished career potential, mental distress in the form of embarrassment, degradation and humiliation which caused her to move to a different state, increased anxiety, increased difficulty sleeping, loss of enjoyment of life, significant weight loss and other non-pecuniary losses.

**113.**    The conduct of Defendant was outrageous and evidence an evil motive or reckless indifference for the rights of Plaintiff and the rights of others, entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendant for economic damages, including, but not limited to: back pay, lost benefits, and front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys'

fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

## COUNT V - RETALIATION IN VIOLATION OF FMLA

**114.**   Plaintiff hereby re-alleges and incorporates by reference the allegations contained in the above-stated paragraphs.

**115.**   Plaintiff was an employee of Defendant for the twelve months prior to her requesting medical leave under FMLA.

**116.**   Plaintiff worked at least 1,250 hours for Defendant in the year prior to her requesting medical leave under FMLA.

**117.**   Plaintiff suffered and continue to suffer from a medical condition affecting self-care, working, sleeping, driving, seeing, learning, reading, communicating, and thinking.

**118.**   This medical condition is a physical condition which involved numerous treatments by a health care provider.

**119.**   At all times, relevant, Plaintiff was continuously seen by a health care provider for her medical condition.

**120.**   Plaintiff's medical condition is a "serious health conditions" as defined by the FMLA.

**121.**   Plaintiff is entitled to take leave for up to twelve (12) weeks because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

**122.**   Defendant began treating Plaintiff differently and negatively when she began to take increased FMLA leave for her medical condition.

**123.** Plaintiff's taking leave was a motivating factor in Defendant's decision to terminate/constructively discharge Plaintiff.

**124.** As a direct and proximate result of the Defendant's actions and/or omissions, Plaintiff has been deprived of income, including wages and benefit as well as other monetary and non-monetary benefits.

**125.** As a further direct and proximate result of Defendant's actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress and mental anguish and pain, and related compensatory damages.

**126.** By failing to take prompt and effective remedial action, Defendant, in effect condoned, ratified and/or authorized the discrimination against Plaintiff.

**127.** As shown by the foregoing, Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of the Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendant for economic damages, including, but not limited to: back pay, lost benefits, and front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

### Demand for Jury Trial and Designation of Place of Trial

Plaintiff requests a trial by jury, in Kansas City, Kansas, on all counts and allegations of wrongful conduct alleged in this Complaint.

Respectfully Submitted,

EDELMAN, LIESEN & MYERS, L.L.P.

/s/ Sarah C. Liesen _____
Sarah C. Liesen      KS #26988
sliesen@elmlawkc.com
4051 Broadway, Ste 4
Kansas City, Missouri 64111
Telephone: (816) 301-4056
Facsimile:  (816) 463-8449

ATTORNEY FOR PLAINTIFF

18