# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| JULIE A. SMITH, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | Case No. 2:18-cv-02340-CM-ADM |
| v. | ) | |
| | ) | |
| KANSAS PUBLIC EMPLOYEES | ) | |
| RETIREMENT SYSTEM, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## **PRETRIAL ORDER**

U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case on November 1, 2019.  Plaintiff Julie A. Smith (hereinafter, "Plaintiff" or "Smith") appeared through counsel, Sarah C. Liesen and Alexander Edelman.   Defendant Kansas Public Employees Retirement System (hereinafter, "Defendant" or "KPERS") appeared through counsel, Tammy M. Somogye and Thomas V. Murray.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

## 1.     PRELIMINARY MATTERS.

**a.     Subject Matter Jurisdiction.**  Subject matter jurisdiction is invoked by Plaintiff under 28 U.S.C. § 1331 and is disputed to the extent that sovereign immunity is characterized as a subject matter jurisdiction issue.   KPERS contends that it is immune from suit in federal court

because it is an instrumentality of the State of Kansas pursuant to K.S.A. § 74-4903.  Smith disputes that KPERS has sovereign immunity.[1]

KPERS contends that the Court has supplemental jurisdiction over its counterclaim pursuant to 28 U.S.C. § 1367 because it forms part of the same case or controversy, and was compulsory pursuant to Fed. R. Civ. P. 13.  The parties do not dispute supplemental jurisdiction over KPERS' counterclaim to the extent that the Court has original subject-matter jurisdiction over Plaintiff's claims, but they dispute the extent to which KPERS' assertion of this counterclaim impacts whether KPERS is entitled to sovereign immunity.  Smith contends that KPERS's counterclaim is inconsistent with its assertion of sovereign immunity, but KPERS disputes this.

    **b.**    **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

    **c.**    **Venue.**  The parties do not dispute that venue in the District of Kansas is proper, but they dispute the place of trial.  Plaintiff contends the case should be tried in Kansas City, whereas KPERS contends the case should be tried in Topeka.  *See* K.S.A. § 74-4904 ("All actions or proceedings . . . against the system shall be brought in Shawnee county.").

    **d.**    **Governing Law.**  Subject to the court's determination of the law that applies to the case, Plaintiff believes that Counts I and III of the First Amended Complaint (Doc. 64) are governed by the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.  ("ADA"); Counts II and IV are governed by the Age Discrimination in Employment Act 29 U.S.C. § 621 et seq. ("ADEA"); and Count V is governed by of Family and Medical Leave Act, 29 U.S.C.A. § 2611 et seq. ("FMLA").  KPERS believes that its sovereign immunity claim is governed by the Eleventh

---

[1] The court denied KPERS's Motion for Leave to Amend Answer to Include Sovereign Immunity Defense, without expressing any opinion as to whether KPERS has waived that defense. (Doc. 107.)  KPERS filed objections to this order.  (Doc. 109.)

Amendment to the United States Constitution and related case law.  KPERS's status as an instrumentality of the State of Kansas is governed by K.S.A. §§ 74-4901, *et. seq.*  The parties agree that KPERS's breach-of-contract counterclaim is governed by Kansas law.

**2.      STIPULATIONS.**

      a.      The following facts are stipulated:

            1.      Plaintiff is a citizen of Stillwell, Johnson County, Kansas.

            2.      KPERS is located at 611 S. Kansas Avenue, Topeka, Kansas 66603.

            3.      Plaintiff was employed by KPERS from May 12, 2008, through August 23, 2017.

            4.      Plaintiff began her employment with KPERS as a Fixed Income Investment Officer.

            5.      On October 23, 2017, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against KPERS.

            6.      On March 30, 2018, the EEOC issued Plaintiff a Notice of Right to Sue.

      **b.**      The parties have stipulated to the admissibility of Deposition Exhibits 14, 15, 45, 46, 49, 51, 59, 60, 61, 62, 63, 70, and 78 for purposes of summary judgment.

**3.      FACTUAL CONTENTIONS.**

      **a.      Plaintiff's Contentions.**

Plaintiff began her employment with Defendant in May of 2008.  Elizabeth Miller (hereinafter "Miller") became Plaintiff's supervisor in March of 2011.  Bruce Fink (hereinafter "Fink") also became Plaintiff's supervisor in September of 2013.

In April of 2013, Plaintiff applied for Family and Medical Leave Act ("FMLA") leave because of her medical condition—migraines.  Plaintiff's migraines affect her major life activities,

including self-care, working, sleeping, driving, seeing, learning, reading, communicating, and thinking.  In or around 2014, Fink and Miller asked Plaintiff why she had been coming into work late, and Plaintiff said it was because of her migraines.  (Before this, Plaintiff had told Miller about her migraines.)  During this meeting, Plaintiff had a migraine.  Miller stated, "Oh, you have a headache" and walked out of the room.  This upset Plaintiff and she cried in the meeting.

In 2014, Fink and Miller harassed Plaintiff because of her FMLA leave and migraines. Beginning in 2013, Miller kept extensive notes on Plaintiff's FMLA leave and often wrote alternative reasons Plaintiff was out, such as "Fog" or Thunderstorm in area this morning."  In approximately 2015 and 2016, Plaintiff began to suffer more frequent and intense migraines and Fink began to pick at her work more often.  In June of 2015, Plaintiff was restricted from taking her usual work-from-home day if she had taken FMLA leave earlier in the week.  Around August of 2015, Fink ended Plaintiff's work-from-home day, which increased her driving time.  Fink, Miller, and Baker regularly met about frustrations with Plaintiff's FMLA use.  They called it "unworkable" and discussed options including an early retirement buy out, restructuring and transferring Plaintiff, and terminating her for under performance (Fink's preferred option).

Fink picked on minor things in Plaintiff's work in order to have a reason to terminate her because of her medical condition and for using her FMLA leave.  For example, on or about January 19, 2016, Fink wrote a letter to Plaintiff that addressed typos in Plaintiff's draft memos from September 2015, November 2015, and January 2016.  The letter addressed an incorrect date in the September memo draft, and a few typos such as writing "mortgaged backed securities" instead of "mortgage backed securities."  Plaintiff believed that she was being extra-harshly criticized on minute details due to her migraines, and Baker agreed that Fink was being overly picky.  Baker told Plaintiff she could write a formal complaint.  Plaintiff worried that it would only make the

4

situation worse, and Baker agreed.  From approximately 2014 through 2017, Plaintiff complained to Human Resources approximately three to five times a year about her treatment.  Human Resources did not investigate Plaintiff's complaints.

On or around April of 2016, Plaintiff renewed her FMLA request and she was notified that she would now need to re-certify her FMLA request every six months instead of annually.  Miller did not believe Plaintiff was suffering from migraines as often as she had been reporting.  Miller also did not believe Plaintiff could have a migraine in the morning and be able to recover enough to come to work within two hours.  Baker told Plaintiff that she would need to get a doctor's note stating that it was possible for Plaintiff to have a migraine that could subside enough to work within four hours, while other migraines may last one to two days.  Plaintiff's doctor provided this note.

Baker also told Plaintiff to call Miller as soon as she knew she was having a migraine and would miss work, even if it was in the middle of the night.  So Plaintiff sometimes got up at 3:00 a.m., when she was in severe pain, to leave a message for Miller.  These requirements were placed on Plaintiff because of her medical condition, her taking FMLA leave, and to make it more burdensome for her to take FMLA leave.

On April 27, 2016, Plaintiff told Fink that she had a debilitating migraine and would not be able to come in at 8:00 a.m. but that she wanted to try and be there for a 1:15 p.m. meeting that day.  About one hour before the meeting, Plaintiff realized that her migraine would make it impossible for her to attend the meeting, so she told Miller as much.  On or about May 18, Plaintiff was counseled for missing the meeting and potential disciplinary action was threatened.

On or about May 27, Plaintiff was told that she would no longer be allowed to take FMLA leave in the amount of time she needed and then come to work, but would only be allowed to take

a full day or half day of leave.  Plaintiff was told that if she requested two hours of leave for her medical condition, her supervisor could require her to take four hours.

On or about June 30, Fink gave Plaintiff an "Unsatisfactory" rating on her annual review and Plaintiff was put on an improvement plan for six months.  Before this, Plaintiff received "Exceeds Expectations" or "Meets Expectations" reviews in 2008-2015.  Plaintiff was not given the "Unsatisfactory" rating due to her performance, but because of her disability and/or in retaliation for taking FMLA leave.  Plaintiff's migraines have never caused her to take more time off than she was allowed for sick and vacation time.   On or about December 31, 2016, Plaintiff was informed that her performance was getting better in some areas but still needed improvement. Fink often brought up items that were not policy violations and differed from review to review.

On or about June 14, 2017, Plaintiff arrived for her performance review with Fink. Defendant's Executive Director Alan Conroy, Baker, Fink, and Miller were all present.  They informed Plaintiff that Defendant had decided to let her go and gave her three termination "options": (1) accept a termination effective July 14, 2017, with her last day worked being the current date; (2) accept a resignation effective September 15, 2017, with her last day worked being the current date; or (3) accept a short-term (17.5-month) employment agreement, taking a demotion to an Investment Strategist position from June 16, 2017 to October 1, 2018.  All of these options resulted in Plaintiff's termination.  Plaintiff was given until 9:00 a.m. on June 16 to consider the options.  She was told not to come back to work until June 16 when she had a decision. If Plaintiff did not choose one of these options for termination, she would be terminated.  Due to Plaintiff's stress of having no income, she accepted the last option.

Plaintiff was in her late fifties.  After accepting the demotion to Investment Strategist, she was required to train the individuals who would take over her workload—a male employee in his

mid-thirties and another in his early forties.  When older individuals ended their employment with the company, younger employees were hired to take their place.  Plaintiff felt shunned by her co-workers and managers and excluded from department meetings.  She initially believed she was not invited to a quarterly investment meeting by accident, so she attended the meeting.  When she arrived, Miller stated in front of three other employees, "You realize this is an investment meeting and you do not need to be here."  Plaintiff felt humiliated.  She was not allowed to attend these meetings or the compliance meetings every month.  Excluding her from these meetings made it impossible for her to do her job because she could not complete the reports that incorporated information gathered from those meetings.

Plaintiff complained to Baker about discrimination and retaliation for being excluded from these meetings, and Baker informed Plaintiff that she could make a formal complaint.  On or about August 14, 2017, Plaintiff made a formal complaint and it mentioned that Baker had previously discouraged Plaintiff from complaining about discrimination.  After Plaintiff made her formal complaint, the retaliation and shunning became worse and got to the point that no one in the office would speak to her.  By approximately August 23, Plaintiff was suffering from anxiety, depression, difficulty sleeping, nausea, and lack of appetite caused by increased work harassment.  On or about August 23, Plaintiff was constructively discharged prior to her October 1, 2018 termination date.  On or about August 23, Plaintiff was clearing her belongings out of her office and asked one of her coworkers for assistance carrying a painting.  Plaintiff's coworker hesitated and Plaintiff asked him, "Do you not want to be seen with me?"  The coworker did not respond.  This coworker had previously been friendly with Plaintiff, but he was now afraid to be seen helping Plaintiff.

b.      **Defendant's Contentions.**

KPERS denies Plaintiff's claims.  KPERS acted in good faith and in compliance with all applicable laws.  KPERS is an instrumentality of the State of Kansas and its employees are employed by the State.  The State Treasury receives employer and employee contributions, which are invested and held in trust for KPERS's members.  Currently, the retirement fund totals approximately $20 billion.

When Plaintiff began her employment as a Fixed Income Investment Officer ("FIIO") in 2008, she asked to work from home one day per week to avoid commuting from Johnson County to Topeka, which is approximately 144 miles roundtrip.  The then-Executive Director approved her request.  The arrangement was honored when a new Chief Investment Officer ("CIO") and Executive Director were hired (in 2011 and 2012, respectively), despite the fact that they did not like the arrangement and believed everyone in the Investment Division should be working in Topeka due to the collaborative and meeting-centric nature of the work.  The CIO instituted a policy upon her arrival, outlining that employees telecommuting one day per week were to be in the office the other four days of any week in which a holiday occurred or the employee took vacation or sick leave (scheduled or unscheduled).

Plaintiff did not like the long commute.  After her carpool partner resigned in 2012, she applied for a job closer to home.  Shortly thereafter, she asked KPERS's Executive Director if she could work from home two days per week.  Consistent with the belief that Investment Division employees should work in Topeka, this request was denied.  Later, Plaintiff applied for another job closer to home and signed up for a job search website.  In March 2014, Plaintiff asked her migraine physician to tell KPERS that she needed to work from home at least two days per week due to her medical condition.  Plaintiff thought it "would have been nice" to work at home because

her migraines were so frequent.  KPERS never received such a request or any indication from Plaintiff's physician that she needed to work from home for any medical reason.

Plaintiff was in charge of managing more than $4 billion of the retirement fund.  Plaintiff's supervisor began noticing frequent errors in her work.  Eventually, due to Plaintiff's lack of responsiveness on her work-from-home day, and the impact the arrangement was having on her three-person team, KPERS discontinued the privilege.  Plaintiff again looked for a new job closer to home.  About six months later, in March 2016, Plaintiff asked KPERS's Human Resources ("HR") Director about retirement eligibility and was informed that she was eligible to retire with ten years of service, effective May 12, 2018.  In April 2016, Plaintiff began planning for retirement (without informing anyone at KPERS), including participating in a retirement webinar, with a target date of May 2018.  This webinar included information about working after retirement and the impact employment elsewhere would have on her simultaneously receiving KPERS retirement benefits.

Plaintiff continued to make work errors and made significant misrepresentations in reports, which culminated in Plaintiff receiving a Consultation Memo in June 2016.  As a result, Plaintiff was given an Unsatisfactory rating on her annual evaluation and the opportunity to improve via a Development Plan.  Although Plaintiff's performance improved somewhat during the Development Plan, she did not fully accomplish it.  Plaintiff's supervisor and the CIO believed Plaintiff was not performing the work required of a highly-compensated FIIO, receiving a $120,000 annual KPERS salary.  This conclusion was reached solely because of Plaintiff's poor work performance and not because of her age, migraine headaches, and/or use of FMLA leave.

Instead of terminating Plaintiff's employment, KPERS created a position for her that was designed to utilize what she was capable of doing and to satisfy an internal need to work on various

projects for the Investment Division.  In June of 2017, Plaintiff was offered the opportunity to make a lateral transfer – with the same pay and benefits – for a period of 18 months, in exchange for a standard waiver of claims.  KPERS offered Plaintiff this opportunity because she had worked there for several years and was close to reaching ten years of service, a favorable position for an eventual retirement benefit.  The temporary position would also allow her 18 months to find other work, if desired.  Alternatively, Plaintiff could be on paid administrative leave for 30 days, at the end of which her employment would terminate, or she could resign effective September 15. Neither of these options involved a waiver of claims.

Plaintiff was given two days of paid administrative leave to consider these options.  After reading the Employment Agreement five to ten times, reaching out to an attorney friend for a referral to an employment lawyer, and talking to KPERS's HR Director and the CIO to ask questions about it, Plaintiff accepted the transfer.  She signed the Employment Agreement containing the waiver on June 16, 2017, and became an Investment Analyst effective June 18. Shortly thereafter, without KPERS's knowledge, Plaintiff contacted her former employer, DeMarche & Associates, Inc. ("DeMarche") to inquire about being re-hired.  On June 22, 2017, Plaintiff met with a DeMarche representative to discuss her return – after she had informed KPERS that she needed to be absent from work on FMLA leave for the entire day due to a migraine.  On July 10, Plaintiff solidified the date and time for an interview with DeMarche – at 8:15 a.m. on July 18.  Plaintiff did not request time off in advance to attend the interview.  Instead, that morning, Plaintiff informed her supervisor that she needed to be absent from work on FMLA leave due to a migraine.  Plaintiff informed DeMarche that she was looking to leave KPERS because she "doesn't like the commute to Topeka."

Plaintiff accepted a job with DeMarche on August 1 and asked for a start date of September 1 (instead of August 23, as proposed by DeMarche). Plaintiff did not inform KPERS that she was leaving. Instead, she worked on a letter to KPERS's HR Director and the Executive Director claiming discrimination because of her medical condition and taking FMLA, and claiming that the Investment Strategist position was offered to her in retaliation for prior complaints about her supervisors. All of Plaintiff's prior complaints related to the manner in which her supervisors managed all employees in the Investment Division (not discrimination or retaliation). These complaints were not shared with Plaintiff's supervisors because she refused to file a grievance. The letter (dated August 11, 2017) states that she had "been frantically searching for another job." However, Plaintiff had already secured one and planned to leave 12 days later – a week before beginning at DeMarche.

The Executive and HR Directors met with Plaintiff the next business day to discuss the grievance process included in KPERS's Employee Handbook. Plaintiff filed a grievance on August 15, which attached her August 11 letter and requested that her "termination" (*i.e.* her choice to transfer) be rescinded. Other than Plaintiff, the Executive Director, and HR Director, no other KPERS employees knew about Plaintiff's August 11 letter and August 15 grievance. Other than Plaintiff, no KPERS employees knew about her plan to resign 12 days later. The next day, the HR Director asked Plaintiff if she wanted someone outside of KPERS to investigate her claim. Plaintiff also had her husband sign a Retirement Application approving her benefit selection (without KPERS's knowledge). On August 18, Plaintiff responded to the HR Director and requested an outside investigator. Soon after, the HR Director indicated she would ask the State of Kansas's Office of Personnel Services to investigate.

On August 22, 2017, Plaintiff began drafting her resignation letter.  The next morning, the HR Director informed Plaintiff that the investigation would begin on August 25.  Less than an hour later, Plaintiff asked to meet with the HR Director that afternoon.  During that meeting, Plaintiff submitted the resignation letter drafted the day before.  She also submitted her Retirement Application to be effective the same day she was to start her new job.

KPERS was surprised to receive the resignation letter, given the sincere effort made to create an important position for Plaintiff that would have allowed her to reach ten years of service, and the lack of time Plaintiff had allowed for her claim to be investigated.  Plaintiff started working at DeMarche a week later – on her chosen date.  Shortly thereafter, she emailed a colleague, proclaiming that her daily commute to DeMarche is "MUCH better."

Plaintiff applied for FMLA leave in 2013 at the HR Director's suggestion.  Each letter approving Plaintiff's FMLA leave indicated that she must follow call-in procedures for requesting time off.  They also noted that KPERS had the right to request recertification after six months or if her absences exceeded the amount the physician specified.  When Plaintiff requested FMLA leave for late arrivals, KPERS sought clarification because her medical certification referenced only full day absences.  And, when Plaintiff used more FMLA than her physician estimated, KPERS requested that Plaintiff obtain a new medical certification.

KPERS honored all of Plaintiff's FMLA leave requests, even though she frequently violated call-in procedures and did not timely inform her supervisor of her intent to request FMLA leave.  Plaintiff was not required to call in the middle of the night, but rather by 6:45 am, the time she would ordinarily leave her Johnson County home to arrive in Topeka by her 8:00 am start time.  And, if Plaintiff indicated an intent to arrive late and her plans changed, she was to inform her

supervisor as soon as she knew she would not make it in by the stated time, *i.e.* at least an hour and fifteen minutes before, given the length of her commute.

In 2016, because Plaintiff was taking an excessive amount of time off with pay – without using any accrued paid leave (sick or vacation) leave to cover the absences – KPERS instituted the State of Kansas's Office of Personnel Services' recommendation that she be required to use a half day of accrued paid leave if she needed FMLA leave for less than four hours, and a whole day of accrued paid leave if she needed FMLA leave for more than four hours.  KPERS recorded only the amount of FMLA leave Plaintiff submitted on her time sheets, and never required her to use FMLA leave in four- or eight-hour increments.  KPERS also sought advice from the State of Kansas's Office of Personnel Services to ensure that Plaintiff's FMLA rights were honored while her supervisor addressed her unsatisfactory performance.

Through discovery, KPERS uncovered several instances in which Plaintiff claimed to need FMLA leave due to a migraine, when in fact her absence was for a non-FMLA reason.  On other occasions, Plaintiff used FMLA leave for an entire day, despite her ability to work because the migraine had dissipated.  Had KPERS known that Plaintiff had falsified requests for FMLA leave, her employment would have been terminated.

## 4.    LEGAL CLAIMS AND DEFENSES.

### a.    Plaintiff's Legal Claims.

Smith asserts that she is entitled to recover upon the following theories:

1.    disability discrimination under the ADA (Count I) – Plaintiff is (and at all relevant times was) disabled and a qualified individual under the ADA, and KPERS took adverse job actions against her because of her disability;

2.       age discrimination under the ADEA (Count II) – Plaintiff is (and at all relevant times was) over forty (40) years of age, and KPERS took adverse job actions against her because of her age;

3.       retaliation in violation of the ADA (Count III) – Plaintiff engaged in protected conduct under the ADA when she requested a reasonable accommodation for her disability, and when she opposed the discrimination to which she was being subjected;

4.       retaliation in violation of the ADEA (Count IV) – Plaintiff engaged in protected conduct under the ADEA when she opposed the discrimination to which she was being subjected, and KPERS took materially adverse actions against her; and

5.       retaliation in violation of the FMLA (Count V) – Plaintiff engaged in conduct protected under the FMLA when she requested and took FMLA leave, and KPERS took materially adverse actions against her.

6.       KPERS is not entitled to sovereign immunity because it is neither the State of Kansas nor is it an arm of the state in such a way as to provide it with such protection. Even if KPERS could have invoked sovereign immunity, it waived such claims when it admitted in its Answer to Plaintiff's Petition that jurisdiction was proper and when it invoked this Court's subject matter jurisdiction and brought its counterclaim.

**b.       Defendant's Defenses.**

KPERS asserts the following defenses to Plaintiff's claims:

1.       KPERS is entitled to Eleventh Amendment sovereign immunity; the stringent test for waiver under applicable Tenth Circuit law has not been met.  Moreover, Eleventh Amendment immunity may be raised at any time.

2.      Plaintiff's claims are barred by the doctrines of waiver, estoppel, and release.

3.      To the extent Plaintiff's claims are based on acts that occurred prior to any applicable statute of limitations, they are time-barred.

4.      KPERS specifically denies the existence of any causal connection of Plaintiff's alleged damages to the conduct or incidents alleged by Plaintiff.

5.      KPERS' actions were taken in good faith and for legitimate, non-discriminatory, non-retaliatory and non-pretextual business reasons, and were job-related and consistent with business necessity, regardless of any protected status or activity, and not for any discriminatory, retaliatory or illegal purpose.

6.      To the extent Plaintiff alleges that any KPERS employee acted unlawfully, such conduct (if it occurred) was outside the scope and course of that individual's employment, was not authorized or condoned by KPERS and was undertaken without KPERS' knowledge or consent.  Thus, KPERS is not liable for any such conduct.

7.      Even if some impermissible motive were a factor in any employment decision concerning Plaintiff (which KPERS denies), KPERS would have reached the same decision(s) for legitimate non-discriminatory, non-retaliatory, and non-pretextual business reasons.

8.      Any damage claimed by Plaintiff was caused or contributed to by her own acts or failure to act.

9.      Plaintiff's claims are barred, in whole or in part, by her failure to mitigate her alleged damages.

10.     Plaintiff's damage claims are barred or limited by the doctrine of after-acquired evidence.

11.     Lost benefits and compensatory damages are not allowable under the ADEA.

12.     The only remedy available for an ADA retaliation claim is equitable.

13.     Compensatory damages are not available under the FMLA.

**c.      Defendant's Counterclaim.**

1.      Plaintiff breached her Employment Agreement by bringing suit and alleging claims that were waived and released in the Employment Agreement.

2.      Plaintiff's First Amended Complaint is unreasonable and/or without foundation in law or fact, and KPERS is therefore entitled to an award of its attorneys' fees and costs.  If KPERS prevails in this litigation, it will seek attorneys' fees, litigation expenses and costs as the prevailing party, as allowed by 42 U.S.C. § 12205, 29 U.S.C. § 1920 and Fed. R. Civ. P. 54(d).

**d.      Plaintiff's Defenses to Defendant's Counterclaim.**

Smith asserts the following defenses against KPERS's counterclaim.

1.      The contract KPERS's claims Smith breached is invalid and unenforceable because she entered into it under duress and coercion, as she had no choice but to sign it.

2.      The contract KPERS's claims Smith breached is unconscionable and unenforceable because it is shockingly unfair to Smith, releasing KPERS from all liability arising out of her employment while providing her with nothing more than temporary employment and a requirement she be fired "for cause."  She was also presented with the agreement on a take-it-or-leave-it basis, with the alternatives being termination or

resignation, and given less than 48 hours to decide which to choose.  All options presented resulted in Plaintiff's termination.

3.      The contract KPERS's claims Smith breached is not binding because KPERS did not provide any valid consideration.  The only thing Smith received in return was not being immediately terminated, which was not valid consideration because such immediate termination would have been unlawful discrimination and/or retaliation.

4.      KPERS's counterclaim fails to state a claim for which relief can be granted because the purported waiver creates an affirmative defense, not a cause of action for breach of contract.  The claim for breach acts as a fee-shifting provision that must be expressly bargained for.

5.      If Smith's case is dismissed in full or in part because of the sovereign immunity claim, she will raise the defense that KPERS's claim is barred, in whole or in part, by its failure to mitigate its damages.

**5.      DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

**a.      Plaintiff's Damages.**

Plaintiff claims the following damages:

1.      Lost wages (back pay): Approximately $201,500 through trial.  Plaintiff began new employment in about September of 2017 making approximately $70,000 a year with no potential for bonuses.  Prior to this, Plaintiff was making approximately $120,000 a year with the potential for a 15% bonus.  This equals about $50,000 lost wages a year and about $18,000 lost bonus for each of 2016, 2018, and 2019 (no bonus paid in 2017 to department).  Lost wages through the June 1 trial date would be approximately $137,500

and lost bonuses would be approximately $54,000, adjusted for an approximately a 3% raise Plaintiff expected to receive each year.

2.    Lost wages (front pay): Approximately $315,000.  Plaintiff is currently making approximately $50,000 less a year than when she was employed by Defendant and is also not receiving her approximate bonus of $18,000, adjusted for an approximately 3% raise Plaintiff expected to receive each year. Plaintiff intended to retire in December of 2024 so her front wages should be allowed for four and a half years after trial until her intended retirement date.

3.    Increased Expense for Health Insurance: Approximately $84,000. Plaintiff's health insurance is now more expensive and she has less coverage, resulting in more out-of-pocket expenses.  Plaintiff was previously paying around $300 a month for health coverage and is now paying more than $800 a month.  Plaintiff requests the difference in coverage amounts plus additional out-of-pocket expenses of approximately $500 a month she has had to pay. Plaintiff requests this amount through a retirement date of December 2024.

4.    Lost Retirement benefits: Approximately $507,544.20.  Plaintiff estimates approximately $2,819.69 in reduced monthly benefits for about fifteen years for being forced to retire early.

5.    Reasonable attorneys' fees and costs: Plaintiff will request attorneys' fees if she prevails at trial, calculated based on the lodestar method.

6.    Compensatory Damages for Emotional Distress: in an amount determined by a jury.

7.    Costs and expenses incurred herein.

18

8.   Pre- and post-judgment interest at the highest legal rate allowed by law.

**b.   Defendant's Damages.**

Plaintiff's breach of the Employment Agreement has caused KPERS damages of $338,696 to date.  These damages continue to accrue.  If KPERS prevails in this litigation, it will be entitled to attorneys' fees, litigation expenses and costs as the prevailing party, as allowed by 42 U.S.C. § 12205, 29 U.S.C. § 1920 and Fed. R. Civ. P. 54(d).

**6.   AMENDMENTS TO PLEADINGS.**

KPERS filed a Motion to Amend Answer to Include Sovereign Immunity Defense (Doc. 95), which the court denied (Doc. 107).  KPERS filed its Objections to the Magistrate Judge's Memorandum and Order denying this amendment on October 22, 2019 (Doc. 109).

**7.   DISCOVERY.**

Discovery is complete except for one outstanding discovery dispute.  Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations.  Although discovery may be conducted beyond the deadline for completion of discovery if all parties are in agreement to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8.   MOTIONS.**

**a.   Pending Motions.**

Objections to Magistrate Judge's Memorandum and Order Denying KPERS's Motion to Amend Answer to Include Sovereign Immunity Defense (Doc. 109).

**b.   Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

1. KPERS intends to file a summary judgment motion, a motion to determine place of trial, and a motion in limine.

2. Smith intends to file a motion in limine.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **November 15, 2019**.  The parties should follow the summary-judgment guidelines available on the court's website:

http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf

KPERS shall file any motion to determine the place of trial no later than **November 26, 2019.**

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

**c.** **Motions Regarding Expert Testimony.**  All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed no later than **November 15, 2019**.

**9.** **TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **June 1, 2020, at 9:00 a.m. in Kansas City, Kansas.**  This case will be tried by jury.  Trial is expected to take approximately **five (5)** days.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition

testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

IT IS SO ORDERED.

Dated November 6, 2019, at Topeka, Kansas.


s/ Angel D. Mitchell
ANGEL D. MITCHELL
U.S. MAGISTRATE JUDGE